May it please the Court, my name is Jeff Goldstein from the Goldstein Law Group, representing the appellants Kevin Lee, Jennifer Lee, and Nature's Jen, Inc. I would like to reserve five minutes for rebuttal, if that's okay. The clock is supposed to be running, and it is running now. And you just watch it, and when you get to five, stop. In fact, wherever you stop, you'll have the remaining time to be all ears. This case involves a franchisor who, in 1998, devised a program where it would go into competition with its own franchisees, like Mr. Lee, and cut the prices drastically, siphon away customers, and attempt to insulate themselves behind releases and behind reservations in the franchise agreement. There are basically seven to eight components of the fraudulent scheme that plaintiffs' appellants claimed in this matter. As a result of an analysis of the fraudulent scheme, the plaintiffs' appellants claimed that the franchise agreement was a fraudulent scheme. I mean, this is how people sort out their differences, and they sign releases, and, you know, we like releases. What's wrong with having parties by agreement resolve their differences? Justice Kaczynski, I agree 100 percent. When you're talking about a perfectly competitive free market, it's good to have perfect information in the market or as clean information as you can have, and people making decisions on as full information as they can have. The reason why fraud … But there's no such requirement. Parties are responsible for getting their own information, except in rare cases covered maybe by the doctor of unconscionability. The only time you really second-guess, you know, there's no requirement, there's no generalized requirement that everybody have exactly the same knowledge. If that were the case, you could undo every stock transaction, almost every deal, because parties do not always have and almost always have different levels of knowledge or think they do. I agree with Your Honor, but the point is there are certain common law and protections in the CFIL that recognize when there is fraudulent information pumped into the market, you're not going to come out with a fully competitive outcome, which is the goal of having a free market and everybody acting and acquiring information on their own. The law, both under the common law and under the CFIL, specifically prohibits fraudulent and deceitful conduct. And that's exactly what we have here. You don't need the CFIL. Fraud is already prohibited. You know, if you can show fraud, you don't need a statute. All you have to show is fraud. Well, Your Honor, we believe that the CFIL requirements … If a contract is induced by fraudulent misrepresentations, then it's not a deal. Your problem is you haven't gotten anything like that. You want to get sort of extra oomph. Your Honor, we disagree with that. All right. What's the fraud? The fraud, there are several different components of the fraud. Give me the best. The one that's going to make my toes. Let's take a look at the Uniform Offering Circular, and I can give you the site that I'm going to. Let me give you the first one that I would look at that has been completely mischaracterized in this case from day one. That's right. And that goes to Item 19, the earnings claims. Okay. But you've got to tell me where that site is. This is Volume 5. Volume 5. Your Honor. Okay. Page number 334. I have cash, but I'm sorry. That's okay. 334. It's in Exhibit D as in Edward. It must be after 333, right? Okay. What do I have right here? I'm looking at the page, and there's Item 18 it says at the top. Right. That's the page? Am I on the right page? Yes, you are. Okay. Item 19 goes through earnings claims. I'm looking to be horrified. All right. If you go to 0036, there's a footnote 5 or note 5 on that page. It says other. 00 what? I'm sorry. 00336. It's two pages further. It's still part of the same item. I got it. Okay. It says in that other than set forth in footnotes 4 and 11, we are not aware of any other material differences between the operations of the stores being franchised by us and the GNC company-owned stores whose results are reflected in this statement. That is the essence of this argument. Of course they were aware of that. GNC operates its own company-owned stores, and it also franchises through a related subsidiary, through an affiliated company. Of course it knew that one of the major differences was the prices that they were selling to their own stores that competed directly with us. Now, whether or not it's a violation under the protected territory, those are different issues. The issue here is fraud that Your Honor brought up, and it's protected by the CFIL and common law fraud. It was the CFIL. I understand you're sort of going, that's some of the theories under the Copperwell Doctrine and the Robinson-Patman and the Sherman Act that they can't conspire. But here, in terms of what they sell, imputed, they have an explicit cost that they   do their company-owned stores. Some companies, you're right, maybe they wouldn't have an explicit price. They did. And those prices allowed them, if you look in the appendix, you can see the pricing that we're pointing to that permitted, I believe it's Exhibit B in Mr. Lee's affidavit. And there are, if the Court looks at this, and this was not looked at, if the Court looks at that, there are approximately 45 to 50. Is that the unauthenticated document that we're referring to? Yes. This is different than the one that was raised by the defendants. This is not the attachment, Judge Fernandez, that was briefed that the defendant's claim was not attached. Yes, this is authenticated. It's part of Mr. Lee's brief. Excuse me. And I can find this where? I'll show you now. Volume 6. Okay. And it's Exhibit B. There are several Exhibits B. Is it the one near the top or near the end? It's the one near the top. It's Tab 7, and it's Exhibit B. Does it have a number 15 there at the bottom? Yes, it does, Judge. And then you open it up, and it's a big, long table of things. Yes. 8-1. Yes, Judge. Okay. I'm with you. And this is what am I now looking at? This is prepared by Mr. Lee. This is after the competition program was represented to be over and not no longer going to be ongoing. This shows the damage done to Mr. Lee's store. These are items, 1, 2, 3, 4, 5 pages of items sold by GNC to Mr. Lee. And it shows the franchise wholesale cost in the first column. And if you look at number 2. Okay. Franchise wholesale cost is what Mr. Lee pays GNC for the product.  Okay. And if you go over to the last three columns, these are what are called corporate stores. This is the vehicle that they use under the competition program to be placed very close, right outside the territory to our clients and many other franchisees, and then knock the prices below the floor. If you look at the corporate GNC in Fox Hills on that item, you see that it's being sold at $6.49. We buy it at $7.90. That is an absolute. It's not just an isolated. I'm sorry. Which item are you referring to? Number 2, Your Honor. In-system six-way energy. Okay. To my thing, it's a $7.90. Yes. Franchise cost. That's what Mr. Lee pays. And then $9.99 is what they're selling it for. Well, if you go to the end, there's several different corporate stores, Your Honor. This is? This is three of the corporate stores, and we don't have the right age. Six of the right age. In my copy, that column is cut off. I have the Fox Hills current store, and then I have the column that says $9.99. Then I have a blank column. Then I have a column that's cut off. Does this exhibit continue on a different page? No, you have a bad copy, and I apologize. That's crucial, Judge Kaczynski. That's crucial. That corporate Fox Hills store. So whoever put together this excerpt of record copied it so that a crucial document is cut off with exactly the crucial information being excluded? Yes, if that's what you have. I didn't see what you have. I'm taking your word, yes. It was the lawyer responsible, you know. This is your bad. I understand, Judge. I will get you, I will get all of Your Honors a copy of this last column. Well, you have to run it by opposing counsel and make sure that, you know, the excerpt of record of things. Yes. I'll do that. So what does this last column say? The last column shows that on approximately 40, 50 of these items, that the last column, the prices in that last column that they're selling through their own company-owned stores are below what we buy at wholesale. The retail prices that they're selling are below what we sell at wholesale. I mean, even if we sold at wholesale what we bought, we still wouldn't be able to meet those prices. And all those customers have been diverted. And what the Court did was not address this, indicate that there was no information. This is authenticated, Judge Fernandez. This is the kind of rampant fraud that's prohibited by the CFIL. We believe that this is the kind of thing that we should be permitted to get further factual evidence on. There is evidence. This is not a record that there was no evidence whatsoever. Do you want to talk about the releases at all? Yes. When you enter into the deal in the first place, let's say, for example, let's say if somebody entered into it in 1990, one said, look, at the end of the franchise period, we understand we have a choice. We can decide you guys are rotters and stinkers and sue you, sue your pants off. Or we can say, well, you're kind of rotten, but you're good enough that I'd like to keep doing business with you. And so I'd like you to refranchise me. You have those choices. At the beginning, when you're under no duress, you don't have to enter into this deal in the first place. That's the deal you make with them. Okay. Now you get down the line and you found out they are rotters and stinkers. They've been doing all these nasty things to you. Yes. And you say, but I'd like to keep doing business with you, and so I'll sign a release. Right. And you do it. Okay. Okay? That's not what happened here. Well, I can't see that. I can see what the documents say. May I respond? Now, you tell me, in 1990, you did not sign the agreement I just mentioned. Is that true? In 1990, we did sign the agreement. What I'm saying is that the agreement did say what I said it said, did it not? The agreement said what you said it said. However, what my point is – That's what it said, right? Yes. And then later on, you did sign a release and get refranchised. Is that true? We signed a release. We were defrauded at that point. That's where I was disagreeing. Just a second. Don't talk to me about defrauded. All right. I'm talking about what you did. Yes, but what we did, that is correct. This thing comes along, you sign the release, and say, fine, here's the release, and I'd like a new franchise with you, and you got it. I'd like to refranchise, and you got it. We had a right to that franchise, but – You had a right to the franchise if you signed a release, and you did that. Is that true? We signed a release under fraud, but yes. Okay. Fine. You can keep putting the parentheses if you want. We'll come to that in a moment. I'm asking you direct questions. Just answer them. Yes. You had said in the beginning, if we find your rotters, your evil, your all these bad things, we will – we can still franchise with you if we sign a release, and that's what you did. Is that true? We signed a release, yes. And refranchised. Yes, Judge. And you did that. Okay. But you say we shouldn't have had to refranchise, or they defrauded us into signing the release and refranchising. Right? The latter. We're saying that we would – if we – what they told us, they were going to stop this nefarious competition program. That's why we signed the release and the franchising. I understand that. That's different from the thing you're telling Judge Kuczynski about, it seems to me. But that's a little different animal. What you said, they said, they suggested that in the future they weren't going to do this particular competition program anymore. Yes. That's why you signed the release. I understand that's what you're saying. But the point is you did do that. The point is we signed the release, yes. And if indeed, if it turns out somehow that they're saying we're planning to eliminate the competition program is not fraudulent, if that turned out, then as far as at least the first release is concerned, you're finished, right? No, Your Honor, because there are other components in the uniform offering circular. And Judge Kuczynski, he asked me to give him the best. I gave him the best. You're finished on the best one anyway. Is that true? I think they're all great. So I picked one that I thought was – had been misrepresented in the record and wasn't. But all of the things that you were telling me about precede the release. They precede the release, but he was given that uniform offering circular at the time. The release and the franchise agreement are signed at the same time. The uniform offering circular is disclosed before the signing of the franchise agreement as well as the release, Your Honor. So those uniform offering circular fraudulent aspects are still part of what Judge Fernandez was asking me. In terms of the first release, those still go forward under the CFIL as well as common law fraud. Okay. Now you've taken 15 minutes to make your best point. I'll leave you five to make your worst points. I wanted to reserve five minutes. I just thought I would remind you. Okay. Is this your – I have five minutes left for rebuttal. And that's because you said four minutes and 43 seconds. Okay. Thanks, Kevin. I would just like to make one more point with regard to that second release. That second release deals specifically in terms of contract interpretation or interpretation of anything in writing on paper. It specifically only requires that that franchisee alone release. So there's nothing to – You were right. I'm sorry, Your Honor. If that were correct. What's left of the case if everything else is – the district court got right? If that is incorrect – excuse me, if that is incorrect? I'm sorry. No. If you're correct on that. Yes. Then we are – The district court is correct on everything else. What is left of your case? I'm not sure those two things can go together, Judge. If we're right on that second release, then everything goes forward with regard to the CFIL claims, the Uniform Offering Circular Claims, as well as the common law fraud checks. And the reason is that they were not released by the first release? They were not released by the – yes. They were not released by the first release. Okay. If the first release releases everything that it released, the conversation you've just had for 15 minutes. Yes. But the second release only applies to the South Bay Galleria store. Yes. What's left of your case? At that point, there would be nothing left, Judge. All right. Thank you. Thank you. Good morning. I'm Jonathan Solisch for the defendants in this case and the appellees. Given what counsel just said, my question may be immaterial. But I'm having trouble reading the second release as applying to anything other than to the franchise location and the store at the South Bay Galleria. It strikes me that the language is really awfully clear on that and that no ambiguity is created by just – by a generalized clause that the singular equals the plural or by the fact that the Lee's signed it individually because they signed as guarantors. And nothing else seems to me to apply to other things. What's wrong with that view? Well, I appreciate the view and the issue raised. There is a cross-the-board mingling of these two entities throughout the documents and in the end – Well, I don't see that in the second one. I do definitely see it in the first one. And I see it in the 2002 release with respect to the release contemplated for a renewal of that lease. Well, there are specific documents. I don't see it anywhere else. Well, there are specific documents in Volume 6, Tab 7, Exhibit C. I have no idea what that is. Well, what it says is basically the Lee's state that Nature's Gem owns both stores in a series of documents, that Nature's Gem is in fact – Well, it may have owned a million things. That's not – Well, but there's – both stores are basically under the ownership of Nature's Gem. So what? There may be 50 stores that Nature's Gem owns, but it's for these stores. I do think that the – first of all, the release is – goes back and forth between singular and plural. At some points it refers to releasing parties. I think it's also – it talks about the undersigned and their heirs. It may be releasing parties, but the point is that it only applies to that store's doing the releasing. Well, I don't think that it's limited to the one store. You're just – I guess we're repeating ourselves. You're not pointing me to anything that actually tends to change my view in the language of the release that I may be missing, because it's, you know, it's a long release. Well, I think – well, the – Or the long agreement. I – the release itself does state that the lease are individually releasing, and there is a requirement. There's a sort of a cross-default provision which requires that the owners of a corporation have to release, too. And I think the purpose of that is so that you don't continue in business with someone who thinks they have live claims against you. So we should ignore the fact that it says the release has to do with the franchisees, GNC, franchise, and store, both of which are defined in the agreement as the South Bay Galleria. Yes, but I think that the lease individually released as well on the – I think – and also I think the lease were – let me stop the letter. Well, they may have. I mean, but it has to do with that store. That's the point I keep making. The lease and I and you and a bunch of other people could have owned a million stores and could have done the releasing. But it has to do with the franchise and the store. That's what I'm releasing. That's what they are. Whether it's Nature's Gym or both of the lease or the lease and their cat or whatever, their release has to do with the store. But the release is as to all claims of any type. As to the store. I agree. Well, I don't think it says that. I think it says all claims of any type. All right. So if there were a slip and fall dispute between the parties, you think that would have been covered by the release, too? Yes, I do. And I think the intent of the release – At the Westside Pavilion? Yes, I do. And I think that the intent of the release and the estoppel letter went to Kevin and Jennifer Lee. It didn't go to Nature's Gym. Let's say one of the franchisor's employee's offices is at the store and is injured, slips and falls and whatever, so they've got this dispute going, sort of court case going over the slip and fall. Your view, this release would have covered that dispute, too? Yes, I believe it would. And I think under the theory that the parties are going to have a clean slate in going forward and dealing with one another. Counsel, one of the problems that this case presents in that respect is when they signed the release in 1999, that release quite clearly says what you think the new one says. I mean, that release does say your releasing is to all franchise locations. The new one, when they come to sign the new one, and I don't know how that gets bargained out, it doesn't say that at all. It doesn't say you're releasing this to all locations. It only points to this one location. You're correct. That is what it says. Doesn't that cause a slight, shall we call it an interpretational problem at best? When I look at the new document, it looks like it's talking about one location. Well, you correctly noted the differences in language, and I have nothing to add on that beyond what I presented. I don't want to argue the words to death because you've read them correctly. And I think the more fundamental issue here that's overriding on all of this is that you have two releases that were signed, and you can set aside a release. There are legal grounds to set aside a release, but you have to move to rescind it. A release is a, you might call it a negotiable instrument in a courthouse. It can be brought to a judge, and it's a directive to release to dismiss claims. And counsel has claimed in the brief that there's a request for rescission in his complaint, but there isn't. He cites paragraph 240 of his First Amendment complaint. Nowhere does that state anything about a rescission of the documents. And so you have live documents that have been signed. And the problem that counsel can never get beyond is that the quid pro quo, when he signed up, he says that he had an automatic right to renew his franchise. But that's not what the agreement says. It says he has to sign a release in order to renew his franchise. And he did sign releases twice, and he's never moved to rescind the releases. The releases are still, as I said, negotiable. They're live. They have weight and significance. And by not rescinding those, and the reason he doesn't want to rescind them is he doesn't want to give back the renewed franchise. Because when it was clear on the second renewal, the letter was sent out explaining, please don't rely on anything that you claim someone said, or please don't drum up some argument as to why you're going to set this aside. We're not promising you anything, and if you don't want to sign it, don't sign it. They did sign it. Because what they want is the releases. And so what they're really unhappy about is the deal they made in 1990. And that deal, I think, if there's an issue here, I think it's probably, is it unconscionable at the time they signed that deal when they moved from Great Earth Vitamins to GNC? And I think at the time it's not. And this court has said in the C. Ray Boats case that it's not unconscionable under California law or the franchise relations or investment law to say that, to completely deny any renewal right in a franchise. If I have a right to completely deny renewal rights, I think the franchisee is necessarily better off if given the right to renew on a condition. And we've cited, without contradiction from the other side, that this is a standard provision in franchise agreements for renewal rights. And it's so standard that in the U.F.O.C. guidelines, which are adopted by the California Department of Corporations, it uses an example of proper disclosure, the disclosure of a release as a condition of renewal. Let me ask you the flip side of the question, I think, that Judge Reimer asked opposing counsel. And it might be a useless question. Assuming that the second release does not wipe out anything but what went wrong at that store, the first release still wipes out everything that went on at store one, the west side, prior to that release. It does not take care of anything after the release. I take it what counsel says is, well, if all we have left is store one from the release date forward, we don't really have anything to speak of. Is that your understanding of this? If two doesn't wipe out everything that went on at one, then one would still theoretically be viable from the day of the release forward to the present, correct? Am I right? Am I saying that so vaguely, it's not? Well, I just want to make sure I understand what I'm agreeing to. I guess the release to the first store, the 1999 release, would release everything up to the date of the signing of that release. Right. And if they have claims on the first store from 1999 on that aren't wiped out by the second lease, I guess they still have those, if they have any. I think that's right, if the second release doesn't pertain to the first store. I think that's correct. Okay. The question I ask is whether there are any. Well, I mean, I just don't see that they have any viable claim, regardless of the releases and the issues that they raise. And the best case scenario that was given by counsel where they went through this price list, the problem with this document is that this is, if you look at the declaration of Mr. Sorrenti, there was a competition issue going on at the time with Vitamin World, which is a deep discounter in this business. And all of the products, every single one of the products listed on this document that counsel went through is not a GNC brand product. And as Sorrenti said, and it's uncontradicted on the record, every one of these products is widely available from many different suppliers. So counsel has never come forward and said, well, we were able to, someone else offered this product to us at a better price, or your price is twice as high to us. And in effect, it wouldn't make any difference if they could, because either no one else has a better price than we did, or they could have bought the product from someone else. And the agreement makes it clear they can buy anywhere they want except for the GNC-branded product. And what counsel was saying at the district court level is that they were unhappy because they paid unreasonable prices for a GNC-branded product, but they have no evidence of that at all. In fact, none of these products are GNC-branded products. So the problem, I think, that's fundamental above and beyond the releases, which I think are the dominant issue in this case, is that there is no real showing of fraud. When you look at each of these allegations, there are a lot of theories in search of facts, but there's no real facts that hold them up. Well, counsel points to an exhibit to Mr. Lee's declaration as raising a triable issue on fraud with respect to the wholesale price being higher than his retail price would be. Why is that? Well, he's not. But that's he's mixing. He starts with something about wholesale pricing. And then so the issue is wholesale pricing to corporate and outside stores. Then he jumps to a product. He jumps to a document which talks about essentially deep discount. GNC has a super Tuesday, one day a month, where the products are radically discounted to bring in lots of business on that one day. And he's pointing to that retail price at corporate stores. But that doesn't contradict anything in the UFOC. And the only evidence is that was done, those deep discount prices were one day a month, and they were done to counter a substantial competitor in the marketplace who was selling for less. And those items are items that are not GNC products? That's correct. Every one of them is not GNC. And every one of them is widely available from lots of different distributors. And they are allowed under the franchise's agreement to go buy from those distributors if they want? They have free reign to buy from any distributor other than GNC branded product. Thank you, Mr. Searles. Thank you. You had something on the order of ‑‑ I'm sorry. I was talking to the opposing counsel. Thank you. Pardon me. Okay. Well, it's on the class. 303. Thank you, judges. Two quick points. With regard to the issue brought up by Judge Fernandez that we could buy from other sources and that the vitamins listed on that document that I was discussing with you earlier are not GNC. The point of that is not that it violates the promise by GNC to give us reasonable wholesale pricing. The violation there is stark, and it shows that footnote that I read to the Court earlier. The footnote said, We know of no other material differences other than what we put in this Item 12 that I read to the Court. And material differences, when you're selling at wholesale to your own guys at prices that we can't even meet at a retail price, you're automatically out of business ab initio from the first minute. And that's basically what they did. This has nothing to do — it's sort of a red herring to try and tie that argument in, which we're trying to show in that exhibit, Judge Fernandez. It has nothing to do with the argument that we were arguing wholesale reasonably. Well, I don't quite understand. I mean, these are not GNC products. It may be that they sell them at a loss in those Super Tuesdays or whatever. And you're free to sell them at a loss, too. We can't be going out of business. The point is — No, no. I mean, but the fact that they are selling them for less in their retail stores than you choose to sell them in your store doesn't mean they're making a profit on them. They may, in fact, be taking a loss on them and probably be called a loss leader or something like that. But the point is that you've got, like, an airtight price — cost-price squeeze here. We're not talking about, in the abstract, two different retail places. Well, is — is — is opposing counsel Irvine says you could have bought these things somewhere else? Some of those you could have bought somewhere else. But that goes to damages, whether we can show damages. What we're saying is they failed to disclose. It's material. When they sell all those products, and there are hundreds on that item list, when they sell all those products at a price to themselves that we can't even begin at wholesale, we can't. If we drop it a penny, we've lost money. How do you know they're not losing money? Your Honor, it doesn't matter whether they're making profit or not making profit. The question is disclosure. Did they disclose that that's how they run the competition program? That's a very important component of the competition program. And, Your Honor, with regard — I misstated an answer to a question earlier. You said what would go on, what claims would continue. If you look back to the amended complaint, and that would be in Volume I of the excerpt of record, there are two RICO claims that would go forward. In addition, the CFIL claims go forward. CFIL claims cannot be released. And we argued that in the briefing, and we believe it's there. And I have four seconds left. You cannot release CFIL claims. Those go forward. The RICO claims go forward. They go forward regardless of the 2002. So that has nothing to do with my question. It goes forward even if that release is valid. In the first release, Your Honor, I think that's what you're asking. Well, what I'm asking is if the second release only releases claims with respect to the South Bay Galleria store. The second, yes. And the district court is correct on all the other rulings. What's left of the case? On that very narrow issue, I believe that the tortious interference claim goes forward. It was not addressed by the court below. The RICO claims were not addressed by the court below, either. And you can't release by statute RICO claims. So thank you, Judge. Okay. The case is now able to stand submitted. We are adjourned.
judges: Kozinski, Fernandez, Rymer